## THE RICKMERS.

(Circuit Court of Appeals, Ninth Circuit. November 6, 1905.)

No. 1,149.

1. COLLISION—VESSEL DRAGGING ANCHOR—IMPROPER ANCHORAGE.

The bark Rickmers was anchored at night by her tug at Shilshole Bay, in Puget Sound, during a high wind. She dropped her port anchor, which failed to hold, and she drifted and nearly came into collision with other vessels anchored in the vicinity. She was taken back by the tug to nearly the same place and again anchored with her starboard anchor. No attempt was made to ascertain whether the port anchor was holding, and it was found the next morning that the chain was broken. She again dragged her anchor and came in collision with the schooner Stimson, which was previously anchored with other vessels in the vicinity. *Held*, under the evidence, that the Stimson was not in fault, being securely anchored and having proper lights and lookouts; that the Rickmers was in fault in anchoring a second time in the immediate vicinity of the first anchorage, which had proven insecure, in not ascertaining the condition of her second anchor, and in not paying out sufficient cable.

2. SAME—MEASURE OF DAMAGES—PERMANENT DEPRECIATION OF VESSEL.

The measure of damages recoverable for the injury of a vessel in collision is such amount as will restore her to the condition in which she was at the time of collision; but, if the injury is of such character that it cannot be repaired at reasonable cost, an allowance may be made for permanent depreciation, subject to the rule that damages which are uncertain, contingent, or speculative cannot be recovered.

[Ed. Note.—For cases in point, see vol. 10, Cent. Dig. Collision, §§ 286–289.]

3. SAME.

A vessel injured in collision *held* not entitled to recover damages for permanent injury in addition to the expense of repairing, where all known injuries were repaired, and the claim was based solely on general testimony of experts that she was depreciated in value by reason of the collision.

4. SAME—INTEREST.

The allowance of interest on the amount awarded as damages for injury to a vessel in collision from the time when she was repaired and reloaded *held* within the discretion of the trial court.

[Ed. Note.—For cases in point see vol. 10, Cent. Dig. Collision, § 284.]

Appeal from the District Court of the United States for the Western Division of the District of Washington.

This suit was brought to recover damages sustained by the schooner Stimson in collision with the bark Rickmers while the Stimson was at anchor in Shilshole Bay, Puget Sound, in the state of Washington. The appellee is the managing owner of the schooner Stimson, which, it is alleged, was at the time of the collision a new vessel of the value of about $60,000, about 185 feet in length, 40 feet beam, and 14 feet in depth, with a gross tonnage of 701 tons; that for about two weeks prior to the collision she had been lying at anchor off the mouth of Shilshole Bay, taking on cargo from lighters moored alongside, and had aboard at the time of the collision about 650,000 feet of lumber, being about three-quarters of a cargo. It is alleged that the Stimson was properly and safely secured and anchored, was in command of skilful officers and had a full crew aboard, carried the proper riding light brightly burning, and at all times had a proper lookout; that on the afternoon of December 25, 1901, the bark Rickmers, of 279 feet in length, 42 feet breadth, and 24 feet depth and of 2277 tons gross tonnage measurement, while proceeding under tow to the port of Tacoma to load with a cargo of wheat, came to anchor about a quarter of a

mile southwesterly from the Stimson; that two schooners, the Corona and the Mildred, were at anchor in the same vicinity; that about 11 o'clock that night the bark Rickmers parted one of her anchor chains, and dragged from her anchorage toward the other vessels, narrowly missing the schooner Corona, fouling the schooner Mildred, carrying away its bowsprit and headgear, and then striking the Stimson with her port side on the bowsprit, carrying away her jibboom, bowsprit, and all of her headgear and foretopmast, and then ranging alongside, the Stimson holding both vessels for a period of about 15 minutes; that then the combined weight of both vessels in the prevailing wind caused the Stimson's anchor to drag, and both vessels drifted together for a distance of 8 or 9 miles, when the anchor of the Stimson brought up, holding both vessels, and the Rickmers then ran her anchor out and pulled away from collision with the Stimson. The particular damages resulting to the Stimson are specified in the libel, and payment therefor is asked of the owners of the Rickmers, together with damages sustained by reason of loss of time in unloading and reloading cargo, the making of repairs, expenses of towboats, the wages of her master and crew, etc., amounting in all to $22,500. It is alleged that the collision was solely the result of the neglect, want of skill, and improper conduct of the persons in charge of the bark Rickmers, and the fact that the Rickmers was insufficiently and improperly equipped with anchors and cables, and improperly anchored and moored.

The answer of the claimant and master of the Rickmers admits the fact of the collision and the drifting of the vessels together for a time, but avers that the Rickmers was fully found and seaworthy in every respect; that the cause of the dragging of her anchors was the force and fury of the elements, the wind having increased to the force of a hurricane; that every proper and seamanlike precaution was taken to protect the bark from injury to herself and to other shipping; that the night was free from fog, and if a proper lookout had been kept on the Stimson, the collision might have been avoided by the paying out of more chain by the Stimson, and the proper maneuvering of her helm. It is averred that no proper lookout was kept by the Stimson, and no warning of the impending collision given to her officers in time for the proper steps to be taken in avoidance thereof; that because of the fault of the Stimson. the Rickmers suffered severe damage to her hull, rigging, apparel, and furniture, in the sum of $7,500, for which it seeks payment.

It appears from the testimony that the master of the Rickmers was a stranger to the waters of Puget Sound, and that the anchorage in Shilshole Bay was selected by the master of the tug boat. The Rickmers was being towed to Tacoma. Encountering a strong head wind, and night approaching, it was deemed advisable to come to anchor. Accordingly between 4 and 5 o'clock in the afternoon the vessel was anchored in Shilshole Bay, about a mile northeast of the West Point Light. The schooners Mildred, Corona, and Stimson were anchored in the vicinity, to the north and eastward. The Rickmers was in ballast. She was anchored by her port anchor in 14 fathoms of water, paying out about 40 fathoms of chain. A fresh breeze was blowing from southeast and south, with switches from the southwest when the bark came to anchor. The highest velocity of wind between the hours of 4 and 5 o'clock was 18 miles per hour, and it came in gusts around West Point. Under the influence of these gusts of wind the bark drifted to the northward, and when the strain came on the port anchor chain the compressor block split, and 10 or 15 fathoms more of chain were run out. The anchor failing to hold, the bark continued to drift in the direction of the Corona, almost coming into collision with that schooner. The tugboat again took hold of the bark, and towed her to a second anchorage, near the position of her first anchorage, but 10 or 15 fathoms further in shore. The bark then let go her starboard anchor, with 30 fathoms of chain. When the tug towed the bark to her second anchorage, a distance of about 800 or 900 feet, a relieving tackle was placed on the chain, but the port anchor was not raised or sighted.

At 8 o'clock the velocity of the wind was 20 miles per hour. The wind blew mostly from the southeast, but varied occasionally to south and southwest. At 9 o'clock the velocity of the wind was 17 or 18 miles per hour from the southeast. At 10 o'clock the velocity of the wind was 18 miles per hour from

the southeast. At 10:35 the velocity of the wind was 22 miles per hour, and at 11 o'clock it had increased to 24 miles an hour. During this time the wind was changing between southeast and southwest. Between 11 and 12 o'clock the wind varied in velocity from 20 miles an hour to an extreme of 35 miles an hour for one minute, from 11:38 to 11:39. The wind during this hour was from the south to the southwest. At about 10 o'clock the Rickmers again began drifting. Schwarting, the master, testified that the reason the vessel drifted was because there was no holding ground, the ground slipped away from shore; that the Rickmers then came in collision with the Mildred, which was about one ship's length from the Rickmers when she began drifting; that they could not slack more chain because they had no room; they were too near the other ships. · He said they slacked some chain and cleared the schooner, and then ran against the Stimson. He testified that the port anchor chain broke, but he did not know when. The compressor split, and they put a tackle on the chain to hold it. The hook broke, and the witness was of the opinion that the chain broke when the hook broke. After the vessel dragged they saw the chain was slack, and they knew then that the port anchor was gone. He thought that the chain broke just about the time the bark commenced to drag.

Henry Braue, the first officer, testified that after the Rickmers was towed to her second position they heaved in the slack of the port chain and let go the starboard anchor; that the port anchor had 40 fathoms of chain, and the starboard 30 fathoms. He says at 10 o'clock the tackle carried away on the port chain. This tackle was a strap 4½ inches of rope around the chain, and the chain strapped around the foremast and hooked to tackle on the 4½-inch strap. The hook on the tackle was about 1½ to 1¾ inches. This hook broke. After that the chain hung loose over the side of the ship, but they did not know until the next morning when they hauled in the chain that the port anchor was gone. With the anchor had gone 10 fathoms of chain. They got to windward of the Mildred. After drifting from half to three-quarters of an hour, they came into collision with the Stimson.· This would fix the time of the collision at about 10:30 or 10:45, but Richard Sennen, the mate of the Stimson, testified that the watchman called him at 20 minutes to 12; that he jumped out of bed, slipped on his pants and went on deck, and got as far as the mainmast, when the Rickmers crashed into the jib boom of the Stimson. This testimony, which appears to be reliable, fixes the time of the collision at about 11:45. If, then, the Rickmers began to drift about 10 o'clock, she was drifting at least an hour and a half before she struck the Stimson. During this time the first officer testified that they were slacking out the chain of the starboard anchor; when the bark began to drift they had out 30 fathoms, and when they struck the Stimson they had out 90 fathoms; when the bark finally came up and held, they had out 120 fathoms. The Stimson was securely anchored with 105 fathoms of chain, but when she was struck by the Rickmers her anchor was not sufficient to hold against the weight and momentum of the Rickmers, and the two vessels locked together, and dragged northerly along the shore a distance of five or six miles, until their anchors took hold of the ground, and they were separated. When the Rickmers came down on the Corona the latter vessel had out 45 fathoms of chain. Escaping collision with the Rickmers, the Corona dropped her other anchor and ran out 60 fathoms of chain on both anchors. The Corona was a schooner of 394 tons. The Mildred, with which the Rickmers afterwards came in collision, had 65 fathoms of chain to her anchor. Her tonnage was 411 tons.

The court below found that the Stimson was without fault; that she was securely anchored at a place where she had a lawful right to be; that the officers and crew on board at the time of the accident were competent to take proper care of a vessel at anchor; that the regulation anchor light was set, and a vigilant watch was kept on board the vessel; that the Stimson being entirely free from blame, and the Rickmers being the aggressor, there was a natural and legal presumption that the damage which she caused was due to her fault, and to be entitled to exemption from liability she was required to prove good seamanship in her management, and that her ground tackle was in condition fit for the service required, so that there was no imprudence in releasing the tug and trusting to her anchors in view of the existing conditions; that had

the Rickmers been equipped with suitable anchors for a vessel of her size, and with sound cables with sufficient strength, and had been carefully moored by placing her anchors properly so as to have secured the advantage of their combined holding power, with sufficient length of chains and room to swing without coming in contact with other vessels, she would have withstood the storm without damage. The court accordingly found that inexcusable error was committed in choosing the place of anchorage, and held the Rickmers answerable for the damages to the Stimson, in the aggregate sum of $18,680; of which amount $9,388 was specified as expenses paid for repairs, for unloading and reloading, the necessary expenses during 74 days' detention, $5,000 was estimated as the permanent damage by impairment of the salable value of the ship, and $4,292 for demurrage. From this decree the master and claimant of the Rickmers brings an appeal to this court. The appellee has also brought a cross-appeal, claiming error in the allowance by the court of demurrage to the Stimson for 74 days instead of 90 days.

James M. Ashton and Frank H. Kelley, for appellant.
Hughes, McMicken, Dovell & Ramsey, for appellee.

Before GILBERT, ROSS, and MORROW, Circuit Judges.

MORROW, Circuit Judge (after stating the facts). We agree with the court below that the Stimson was without fault. She was riding securely at anchor at the time of the collision, the regulation anchor light was set, and a vigilant watch was kept on board the vessel.

The Rickmers, insecurely anchored, a little more than half a mile to windward, broke from her moorings and drifted down upon the Stimson, causing the injuries described in the libel. The first attempt of the Rickmers to anchor in 14 fathoms of water with 40 fathoms of chain was a failure, resulting in the splitting of the compressor block, the running out of chain, and the drifting of the vessel into such dangerous proximity with the Corona that a collision with that vessel was imminent. The Rickmers was then towed back to nearly her former position, but 10 or 15 fathoms further in shore. The master of the vessel testified that this second position was too near the other ships, and he had no room in which to slack more chain. If the attempt to anchor in 14 fathoms of water with 40 fathoms of chain to the port anchor was a failure, what was to be expected from an anchorage in the immediate vicinity, but 10 or 15 fathoms further in shore, with 30 fathoms of chain to the starboard anchor? Manifestly, the vessel required more room and more chain; she was not anchored in a safe place. It may be contended, however, that in the second position the vessel had two anchors down, the port anchor with 40 fathoms, and the starboard anchor with 30 fathoms. The vessel was headed south, with the shore on her port side. Her first anchorage was with her port anchor. Her second anchorage was 10 or 15 fathoms further in shore, and she then dropped her starboard anchor. If her port anchor was holding at this time, it was on her starboard side, and her starboard anchor must have been dropped at or near the same place, giving no spread to her anchors, if both were holding. But the officers of the vessel had no knowledge of the condition of the port anchor, or whether it was holding or not. It had not been sighted since the bark drifted down upon the Corona,

a distance of more than 800 feet. The vessel had been towed back to her second position either dragging this anchor or hauling slack chain over it. In either event there was not the slightest evidence that it was brought into actual use, while the presumption is that it was not, for the starboard anchor was immediately dropped when the vessel reached the intended anchorage position. The testimony that the chain of the port anchor was hauled in until there was no slack is of no value, since the chain to this anchor broke and the anchor was lost, and no one on board was able to state when this accident occurred. They did not know the port anchor was gone until the next morning, when they hauled in the chain, and found that the anchor, with 10 fathoms of chain, had been lost.

In our opinion, the testimony establishes the fault of the Rickmers beyond question. Her fault consisted: (1) in a want of good seamanship in anchoring the second time in the immediate vicinity of the first anchorage, which had proven insecure, and so close to the other vessels that a sufficient length of chain could not be given to her starboard anchor to secure a holding; (2) in not getting sight of her port anchor so as to ascertain its condition before the second anchorage; and (3) in not paying out more cable to both anchors (assuming that the port anchor was holding), and securing a greater spread for her anchors. For these faults, contributing to the collision with the Stimson, the Rickmers is liable for the damages sustained by the Stimson. The question of damages appears to be the main controversy involved in the case.

"Restitutio in integrum" is the rule of damages in collision cases, and, where repairs are practicable, the general rule followed by admiralty courts in such cases is that the damages assessed against the respondent shall be sufficient to restore the injured vessel to the condition in which she was at the time the collision occurred. The Baltimore, 8 Wall. 377, 385, 19 L. Ed. 463; The Atlas, 93 U. S. 302, 307, 23 L. Ed. 863. If, however, the injuries are of such a character that they cannot be repaired at reasonable cost, an allowance may be made for actual or permanent depreciation, for the reason that an attempt to make complete repairs would involve an expense greatly disproportionate to the amount of such depreciation. Petty v. Merrill, 9 Blatchf. 449, Fed. Cas. No. 11,050. But this allowance in a collision case is subject to the general rule that damages which are uncertain, contingent, or speculative, cannot be recovered, and under this rule it has been held that there is uncertainty when the nature of the damage cannot be determined. It follows that, to recover damages over and above repairs for actual or permanent depreciation, the nature of such damages must be clearly established, and not be left to speculation or uncertainty. In the case of Petty v. Merrill, supra, Judge Woodruff discusses this question with such fullness and clearness as to justify this court in adopting the opinion of the Circuit Judge as applicable to this case. He says:

"I am not satisfied that, upon such testimony, $500 should be allowed, in addition to the cost of the repairs. It rests upon no certain or definite grounds for an estimate. The witness had stated all the cost of making the vessel as

good as she was before; and then, having stated that she would, nevertheless, not be so valuable, he states that she would be as serviceable; and, finally, the cross-examination shows that his estimate of $500 less in value rests upon a conjecture, based upon what he states as a general result of all collisions,—that the vessels sustain a damage that 'will show when they grow old.' This is altogether too vague, uncertain, and unreliable to warrant the inference as a fact in this particular case, that, beyond any injury which the witness could detect by his careful examination as an expert in building and repairing vessels, she had also received some undiscoverable damages which, although it did not render her less serviceable, yet detracted $500 from her value, because it would show when she was old. The elements of calculation or of estimate of amount are wanting. Palpably, the assumed fact of such hidden injury, and its extent and character, are conjectural, and the amount of money required as an indemnity is even more so. It may be conceded that the shock of a violent collision will be felt throughout the vessel; but the injury from that cause, if any, is not to be estimated, and cannot be determined as a fact in a court of justice, by reasoning upon any general rule, such as appears to have guided the witness, if, indeed, his estimate was anything more than a rough guess, without any specific facts to support it. No two collisions are alike in any of their circumstances or results. The injury in any given case must be quite peculiar, if the skill of the shipbuilder, at liberty to employ all the expense requisite, is incapable of repairing it; and, when a vessel is made as serviceable as she was before, any conjecture that she is not as valuable, or that when she is old some damage will appear as the result of the collision, not now discoverable, is too vague and uncertain to warrant a finding of the conjectural amount of damage. There may be proof of injury which, though known, cannot be repaired without unreasonable cost, where the party in fault will be benefited by an allowance for actual depreciation, because an attempt to make complete repairs would involve an expense greatly disproportionate to the amount of such depreciation. But, in general, estimates of depreciation founded in speculative opinions of the probable effect of a collision, where no such effect is known or discernible, and estimates of diminished value, founded as they sometimes are upon the idea that, although the vessel is as serviceable as she was before, yet she will not sell for so much as she would before, are not of sufficient reliability to warrant the taking of the money of one party and awarding it to another. See on this subject, The Isaac Newton, Fed. Cas. No. 7,091; The St. John, Fed. Cas. No. 12,224; The Favorita, Fed. Cas. No. 4,695."

In Sawyer v. Oakman, 7 Blatchf. 290, Fed. Cas. No. 12,402, the same Circuit Judge, in disallowing a claim for permanent depreciation, said:

"The sum claimed by the libelants for estimated depreciation I must disallow. It is, as stated in the commissioner's report, 'to a very great extent a matter of conjecture.' On very clear proof of actual depreciation and of the extent thereof, where it was shown that from the peculiar nature of the injury, it was impossible to make the vessel as good as she was before her injury, I have in one case of collision made an allowance for depreciation over and above the loss of the use of the vessel and the necessary expenses of repairing, etc. But such allowance should only be made upon proof that is clear, and that furnishes a safe guide in determining the amount. From the nature of the subject, the opinions of witnesses, resting largely on grounds that have no relation to the actual value and condition of the vessel when completely repaired, are wholly unsafe, and can be tested by no appreciable rule of estimate. To act upon them is to expose respondents to great danger of injustice, when substantial justice to the libelants does not require it."

In the case of The Isaac Newton, 4 Blatchf. 21, Fed. Cas. No. 7,091, Mr. Justice Nelson disallowed a claim for the difference between the value of the libelants' vessel after she was repaired and her value before the injury, notwithstanding the claim for such a difference in value was supported by testimony that the vessel leaked more after

the repairs than before the damage occurred. The disallowance was placed upon the ground that the shipmaster, who repaired the vessel had stated that she was thoroughly repaired, and had been put in as good a condition as before the injury. The work had been done under the direction of the master of the vessel, and from the sum expended in making the repairs at his instance the court was of the opinion that it would be somewhat strange if the depreciated value should be as large as he had stated.

In the case of The Helgoland, 79 Fed. 123, Judge Brown, of the Southern District of New York, allowed a claim of this character, and, in doing so, drew the distinction between a claim for damages for permanent injury made clear and certain by competent testimony, and where the claim is based upon the vague notion that the vessel is not as good, or will not sell for as much because of the collision. He says:

"Upon examining the testimony, I am of opinion that the allowance of $1,800 for depreciation in this boat should be affirmed. I thus hold upon the ground that the twist given to the boat remained evident and palpable, notwithstanding all that could be done to correct it. The longitudinal bulkheads remained nearly five inches out of place, the deck resting upon the edges of the bulkheads, which were canted to starboard. Repair so as to make the boat completely straight and in her former condition would have been attended with very great expense—far beyond the sum of $1,800 allowed by the commissioner. It seems to me manifest from the nature of the case, as well as from the testimony, that a boat thus sprung and twisted has not the endurance, or the life of a boat not thus strained and out of shape. The qualifications in Mr. Pierce's testimony, reading it altogether, show, I think, that what he means is that for present actual use she has all-sufficient strength to sustain contacts and collisions as before; but that she was built with a considerable surplus of reserve strength, which does not remain in the same degree as before. In the case of Petty v. Merrill, 9 Blatchf. 447, Fed. Cas. No. 11,050 [the case chiefly relied upon by the respondents], Woodruff, J., observes: 'There may be proof of injury, which, though known, cannot be repaired without unreasonable cost, where the party in fault will be benefited by an allowance for actual depreciation, because an attempt to make complete repairs would involve an expense greatly disproportionate to the amount of such depreciation.' That, it seems to me, is precisely the present case. The allowance here is not on the vague notion that she is not as good, or will not sell for as much, simply because she has been in collision, when everything discoverable has been apparently rectified and repaired. Here what remains is palpably not repaired, and could not be without great expense. This boat was one of the finest of the kind ever built, costing about $21,000 a few months only before the accident. An allowance of between 8 and 9 per cent. for the inferior value and enduring power of the boat, is, it seems to me, a fair and moderate allowance, of which the defendant should not complain."

In the case of The McIlvaine, 126 Fed. 434, Judge Waddill, of the Eastern District of Virginia, made an allowance of $1,000 for the permanent injury of a barge; but he did this on evidence establishing specific defects in the barge caused by the collision, and which remained after repairs had been completed. The court says:

"Although the sum of $1,625 was expended in its repairs, the barge was manifestly not put in as good condition as when the injury was sustained; and it is admitted that she is in a curved condition, or six or seven inches to port at her bow, which extends back a considerable part of her length. This defective condition alone, which no effort was made to remedy, on account of the expense incident to the same, would justify the allowance made by the

commissioner, and the proof is that it affects the sale value of the barge $2,000. It was understood at the time of the repairs that the work done was by no means sufficient to place the barge in the condition she was before the collision, and that from $4,000 to $5,000 would be necessary for that purpose, which sum the owner was unwilling to expend, not knowing to whom the fault of the collision would be attributed; and only such amount as would place the barge in a safe and seagoing condition was expended."

In the present case the testimony in support of the claim for permanent depreciation is as follows:

Robert Moran, a shipbuilder, was one of the appraisers who made the appraisement of the damages to the schooner Stimson. He was a member of the firm of Moran Bros., who furnished labor and materials for the repairs of the vessel. He testified that with two others he made a survey and appraisement of the injury to the schooner caused by the collision; that he went on board the schooner and examined her throughout, and made specifications and a report; that in this report he estimated the damages at $8,500, and $1,000 for discharging and reloading the lumber in the ship; that this estimate was a reasonable estimate for the cost of repairing the ship, as well as she could be repaired; but he did not answer that the repairs made the ship as good as she was before she was injured; that would be impossible; it could not be as valuable; the damages the schooner sustained, and the depreciation after the repairs had been made in accordance with the specifications, would probably be 10 per cent. of her value; her permanent damages, which could not be overcome by any repairs put upon her, would be 10 per cent. in addition to the cost of repairing her as fully as she could be repaired; he presumed her value would be between $50,000 and $60,000; that would make from $5,000 to $6,000, or 10 per cent. permanent damages.

H. K. Hall, a shipbuilder, also one of the appraisers, made repairs on the ship. He testified that the appraisers visited the schooner as she lay off in the stream, and examined all the damage that had been done to her as far as they could see, and estimated the cost of the repairs for that damage as near as they could approximate. They found two of the masts were ruined; the deck ripped up, the keelson split, the rails torn off, her rigging was torn off on one side, the whole length of the ship; the quarter chocks were torn up and the quarter rail was carried away, etc. In the survey they described the damages, which, in his opinion, were necessary to be repaired. He made an appraisement of what it would cost to repair that ship, so far as it was practicable to repair her. The damages described in the survey were correctly described, as he found them upon examination; the estimate of $8,500 for the repair of the vessel, and $1,000 for discharging and reloading, was a fair and reasonable estimate; the repairs of the ship contemplated by the report and appraisement would not put the ship back in the condition that she was in immediately before the collision which caused the damages, because the strain that had been put upon the vessel, the wrenching and the twisting that was caused by the collision, had damaged the vessel to an extent that could not be replaced by any repairs that could be put upon her; it would take the vitality out of the

vessel at least 10 per cent.; after making the repairs contemplated by the survey the ship was worth 10 per cent. less than it was immediately before the collision; measured in money, it would be about $6,000. On cross-examination this witness was asked if there was anything strained or broken about the vessel or hull. His reply was that there was something that was remarkable, that showed a tremendous strain had been wrought upon that vessel; the masts from the deck down to the keelson, where it was stepped into the keelson, had been strained, a severe strain that came upon the masts, had split the keelson for the length of 60 feet, and it was ruined. He was asked "Did you renew that?" His answer was "Yes." His testimony was continued as follows:

"Q. That is included in your bill, is it? A. Yes, sir. Q. Now, after you renewed them, did not that make her as strong as before? A. Made her as strong as before, that portion of the work, fully as strong as before. Q. And that would apply as to the other repairs that you made, would it not? A. All the other repairs, yes. Q. Be just as good as they were before? A. As far as the repairs were concerned, but it don't relieve the vessel from the strain. Q. Well, was the vessel wrenched any? A. Yes. sir. Q. Twisted? A. Of course; necessarily must be. Q. Well, was she? A. Certainly she was. Q. Well, in what way, outside of the keelson, that you spoke of? A. No, the general strain she showed it by the oakum that had started out of her sides, necessitating recalking her all over. Q. Did you do any recalking? A. Yes, sir, we did. Q. That is included in the bill? A. That is included in the bill. There was not a portion of her deck, but what the oakum had chewed out. Q. You say this bill was paid by Stimson Brothers? A. It was, yes, sir. Q. Your bill for repairs? A. Yes, sir. Q. And you did no other work on the ship except that shown by your bill? A. That is all, sir."

F. J. Burns, an insurance agent and a surveyor for the Marine Board of Underwriters of San Francisco, was the surveyor who surveyed the damages to the schooner, and one of the appraisers. The other appraisers were Hall and Moran, the previous witnesses. He testified that they examined the vessel very carefully, and found broken masts and the rigging broken as described in the survey reports; that the reports correctly described the nature and extent of the injuries found, and in the appraisement they correctly estimated the fair and reasonable cost of making repairs, including the cost of loading and unloading the vessel. They estimated the cost of repairs at $8,500; this was a fair and reasonable estimate of what it would cost to make the repairs. Upon this testimony, and itemized bills of expenses actually incurred, the court awarded $9,388 for expenses paid for repairs and for unloading and reloading and necessary expenses of the ship during 74 days of detention. The court also awarded $5,000 for permanent damage by impairment of the salable value of the ship.

The evidence to which we have referred establishes the actual expenses incurred in repairing all known injuries to the vessel, but does not establish clearly or satisfactorily any permanent injury to this vessel not included in the cost for repairs and allowed as such. It is true there is testimony that after the ship had been repaired she was worth 10 per cent. less than she was worth before the collision; but such an estimate is plainly speculative and uncertain. It is not based

upon any facts; there are no remaining injuries or defects pointed out; there is no injury or defect known or discernible to which this estimate can be applied. There is no known injury to any particular part of the vessel to which the court can refer and say, for this injury which has not been repaired, an award of damages is made as and for a permanent injury. The rule of damages requiring certainty does not justify such an allowance.

The allowance of interest is within the discretion of the court. Hemmenway v. Fisher, 20 How. 258, 15 L. Ed. 799; The America, 11 Blatchf. 485, Fed. Cas. No. 285. The collision occurred on the 25th day of December, 1901. The libel was filed January 28, 1902. The court below allowed interest at the rate of 6 per cent. per annum upon the sum of $18,680 from the 25th day of March, 1902. This latter date appears to have been fixed for the commencement of interest because at that date the repairs on the schooner had been completed, and the schooner had been reloaded to the extent that she was loaded at the time of the collision. The decree was not entered in favor of the libelant until November 7, 1904. This delay in the proceedings in court does not appear to be chargeable to the libelant. The allowance of interest was, therefore, under all the circumstances, an element of compensation, and not punitive damages, and was properly allowed upon the amount expended for the repair of the vessel, but should not be allowed upon the $5,000 claimed as permanent injury, which we have determined was not established.

It is next objected that the court erred in allowing demurrage at the rate of $58 per day for 74 days, amounting to $4,292. The collision occurred on December 25, 1901. On March 25, 1902, the schooner was reloaded to the extent that she was loaded at the time of the collision. This was a delay of 90 days. The libelant has accordingly appealed from the decree allowing demurrage for 74 days, claiming that the demurrage should have been for the period of 90 days. It appears that the account of expenses submitted in evidence covered the period from December 10, 1901, to March 9, 1902, including 15 days before the collision, and excluding 15 days before she was reloaded to the extent she was before the collision. The libelant, in support of his cross-appeal, contends that the court below made the mistake of basing the demurrage upon the period from December 25, 1901, when the collision occurred, to March 9, 1902, when the account of expenses closed, instead of the actual delay. The rate of demurrage appears to have been based upon the evidence that the net earnings of the schooner for a single voyage of 60 days were $3,500, or about $58 per day. It is probable that the court was of the opinion that for every voyage of 60 days there would be an average delay in the port of loading and the port of unloading, amounting to 14 days. This was a reasonable estimate, and there is nothing in the record that enables the court to determine either that the allowance was excessive, as claimed by the appellant, or insufficient, as claimed by the appellee.

The decree of the court below is reversed, with instructions to enter a decree in favor of the libelant for $13,680, against the claimant and

his surety, with interest at the rate of 6 per cent. per annum from the 25th day of March, 1902, to the date of the original decree, on November 7, 1904, with the costs taxed at $326.57, and the costs of this appeal.