## THE TREMONT.

(District Court, W. D. Washington, N. D. August 15, 1906. On Rehearing, January 8, 1907.)

### No. 2,784.

COLLISION—STEAM VESSELS CROSSING—FOG.

A collision at night in a dense fog near Marrowstone Point between the large steel steamship Tremont starting on a voyage from Seattle to the Orient, and the steamship Ramona, on a crossing course, which struck the Tremont on the starboard side, *held* due to the fault of both vessels, the Tremont in going at a rate of speed which under the existing conditions, her size, the dense fog, and the number of other vessels in the vicinity was excessive, and in not stopping and waiting for the Ramona, whose fog signals were heard, to pass before changing her course to enter Pt.·Townsend Harbor; the Ramona for not stopping and navigating carefully as required by article 16 of the Inland Rules (U. S. Comp. St. 1901, p. 2880) on hearing the fog signals of the Tremont forward of her· beam instead of assuming, as her master did, that the Tremont was a meeting vessel on her port side, and keeping on at a speed of five or six knots per hour.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 10, Collision, §§ 170–175.

Collision rules. ˙Speed of steamers in fog, see notes to The Niagara, 28 C. C. A. 532.]

In Admiralty. Suit for collision.
The following is a map of the locality of the collision:

J. B. Howe, for libelant.
W. H. Bogle, for The Tremont.

HANFORD, District Judge. A collision occurred between the steamships Tremont and Ramona on a foggy night in the month of August, 1904, and the questions to be adjudicated in this lawsuit relate to the responsibility for said collision. The Ramona is presumptively the vessel in fault because she rammed the Tremont on her starboard side 62 feet abaft her stem, but there are other circumstances to be considered. The Tremont is a large iron or steel vessel more than 500 feet in length, having twin propellers, and at the time of the collision she was outward bound, carrying a cargo of 10,000 tons of freight from Seattle to Oriental ports. According to the testimony

of her pilot, corroborated by her captain and other officers, she left her berth in Seattle harbor some time after 9 p. m., and was headed on her course out of the bay at 10:17 p. m. Running at her ordinary full speed she made Point-No-Point at 12:10, and at 12:15, on account of fog gathering and settling around her, her speed was reduced to half speed, and at 12:30 on account of density of the fog then prevailing, her speed was again reduced and she continued running slow. Her whistle was used, giving fog signals, regularly and continuously, from the time of getting into the fog near Point-No-Point, and when she rounded Marrowstone Point fog signals of other steamers were heard in Pt. Townsend bay, and in the direction of Pt. Wilson, and in the direction of Whidby Island. The fog signals of a steamer which the event proved to be the Ramona were heard from 5 to 10 minutes before the collision, and the Ramona's signal was repeated at short intervals alternating with the Tremont's signals continuously until the time of the collision. All of the Ramona's signals appeared to be about six points off the Tremont's starboard bow, indicating that she was coming toward the Tremont from the direction of Pt. Wilson. The Tremont passed Bush Point at 12:45, and made Marrowstone Point at 1:40, and the collision occurred at 2:05. At that time the Tremont was making no headway, and not under control of her helm, being held on her course by alternating movements of her starboard and port propellers. The fog was so dense that an approaching vessel could not be seen at a greater distance than 100 to 150 feet, and as soon as the Ramona came in view, the Tremont's engines were reversed and started working full speed astern. The Ramona came at right angles to the Tremont's keel, striking her starboard side about 60 feet abaft her stem. The estimated speed of the Tremont, with her engines working slow, is two or three knots per hour.

By reference to the map, it appears that the distance from Seattle to Point-No-Point is about 23 miles, and it is about 9 miles from Point-No-Point to Bush Point, and about 6 miles from Bush Point to Marrowstone Point. Therefore, the foregoing statement of the Tremont's pilot with reference to the speed and movements of the Tremont cannot be correct, for, by his statement going at full speed she was 1 hour and 53 minutes making the run of 23 miles from Seattle to Point-No-Point, then going five minutes at full speed, 15 minutes at half speed and 15 minutes slow, with speed estimated at from 2 to 3 knots per hour she made the run of 9 miles to Bush Point, and continuing slow she made the next run of 6 miles to Marrowstone Point in 55 minutes, arriving there as the pilot states at 1:40 a. m., and the ship thereafter made very little progress ahead until after the collision. It is to be noted that if the captain of the Tremont made any marine protest, that document was not offered in evidence, and the private memorandum of the pilot does not show that any order was given to stop, nor to reverse at any time before the collision happened, the last order noted being to "slow" given at 12:30. On the other hand, there is positive testimony of witnesses who were on board the "Ramona" that they could see by the wash of the water along her side that the Tremont was making way through the water when she was first seen,

and continued until she disappeared in the fog very quickly after the collision. For these reasons, I find that the Tremont did not stop at Marrowstone Point. To make the run from Point-No-Point to the place where the collision occurred, as she did, in 1 hour and 55 minutes, her average speed must have exceeded 6 miles per hour, and I find that she was going at approximately that rate of speed until her engines were reversed 1 minute before the collision. In computing time I am guided by the testimony which refers to the pilot house clock, which appears to have been faster than the clock in the engine room, and I assume that the Tremont did reach Point-No-Point at 12:10 and that the collision occurred at 2:05 a. m.

The engineer's log makes the case no better for the Tremont than the testimony of the pilot, for by that record the ship started at full speed, in Seattle harbor at 11 minutes after 10 p. m., by the engine room clock, and ran without reducing speed until 12:21, when the bell was rung for slow speed, and the subsequent notations in the log are as follows: At 12:22 port engine half speed, starboard engine two bells—12:29, port engine one bell, starboard engine one bell ahead—1:37 a. m., both engines stopped—1:42 starboard engine one bell ahead—1:43 starboard engine stopped—1:45 both engines one bell ahead—1:46 port engine stopped—1:47 port engine two bells ahead—1:49 port engine one bell—1:55 both engines stopped—1:58 both engines full speed astern—1:59 both engines stopped, that being the time of the collision by the engine room clock and by the Ramona's time. This record, like the pilot's testimony, is impeached by the physical conditions of time and distance, and the ship's capacity to make speed. Giving some consideration to the pilot's testimony, 30 geographical miles is a liberal allowance for the 2 hours and 10 minutes during which the Tremont was going full speed ahead from Seattle. That leaves her 1 hour and 38 minutes for running the remaining eight miles to the place of collision, and, if the engineer's log is true, during 10 minutes of that time both engines were stopped, 1 minute both engines were reversed, 2 minutes the port engine was working ahead full speed with the starboard engine working ahead under one bell, and 9 minutes the engines were alternately working ahead under a slow bell; leaving 1 hour and 16 minutes for the ship to have made the 8 miles under a slow bell. But the experiment made by Mr. Walker, the expert witness, proves that the ship's speed under a slow bell for 9 minutes, starting from standstill, was only 4.69 knots or within a fraction of 4⅞ miles per hour, allowing for momentum at the start, her slow speed on this run would have been proximately 5 miles per hour, so that she could not possibly have reached the place of the collision at the time when it undoubtedly occurred if she had dallied for 22 minutes, as indicated by the engineer's log, for it would require 1 hour and 36 minutes continuous running at slow speed to get over the distance of 8 miles.

The Tremont did change her course by swinging around Marrowstone Point to enter Pt. Townsend Bay. Whether that change of course was made before the Ramona's signals were heard on board the Tremont is a matter of uncertainty in the light of the testimony, but

as the Tremont's signals were heard by those on board the Ramona, off the Ramona's port bow, it is reasonably certain that the Tremont did make her swing to the westward after her signals had been heard on board the Ramona, and after the Ramona's signals should have been heard, and noted, on board the Tremont, if her officers and watchmen were vigilant as they should have been, and the swinging did occur within a period of from 5 to 10 minutes previous to the collision.

I find from the evidence in the case that the Tremont was guilty of fault No. 1, in going at a rate of speed which under the existing conditions, considering the dense fog and the number of other vessels in the vicinity and her own immense size, was excessive; and, fault No. 2, in not stopping and waiting for the Ramona to pass before changing her course to enter Pt. Townsend Harbor; and that both of these faults were contributing causes of the collision.

I must also find that the evidence does not exculpate the Ramona. When her captain heard the Tremont's fog signals off the port bow of his vessel, he assumed that the signals were from a steamer going in the opposite direction, and nearly on the same track as his own vessel, and that she would pass, according to the rules of the road, on the port side. This was an error. A navigator has no right to assume anything in regard to the steering course of a steamer under way which he is unable to see by reason of the density of fog and whose fog signals are heard forward of the beam of his own vessel. Because of that error of judgment, the Ramona's captain failed to stop her until he realized that there was imminent danger of a collision, when it was too late to avoid it. The Ramona is a wood steamer 195 feet long, and going at full speed makes 10 or 11 knots per hour. On the night of the accident she was on her regular run from Vancouver to Seattle, and reached Pt. Wilson at about 1:32 a. m., by her own time, which appears to have been the same as the engine room time of the Tremont. At Pt. Wilson her speed was checked, and then at 1:35 she went ahead towards Marrowstone Point, and ran at full speed for 18 minutes, during which period she was in a dense fog, and sounding fog signals continuously. On hearing the Tremont's signals the Ramona's speed was reduced to about five or six knots per hour, and at that rate she continued on her course five minutes. Then realizing that there was danger of a collision, her captain ordered the engines reversed and to work astern at full speed, which order was promptly obeyed by the engineer, but without perceptible effect before the impact of the collision. I do not find the Ramona to have been in fault for going at an excessive rate of speed previous to the time of hearing and locating the Tremont's fog signal, but in view of all the circumstances, to have complied with the requirements of article 16 of the rules prescribed by Congress to avoid collisions in inland navigation, the order to reduce speed given at 1:53 a. m. should have been promptly followed by an order to stop, and by giving the inquiry signals prescribed by that article. U. S. Comp. St. 1901, p. 2880. I therefore find that the Ramona was in fault for nonobservance of article 16, and said fault was a contributing cause of the collision.

· The result of the above conclusions must be a decree for a divi-

sion of damages. The evidence proves that the amount of the damages recoverable by the libelant for cost of repairs to the Ramona, and expenses during the time of her necessary detention amount to $978.41. The answer calls for proof of the fifth paragraph of the libel, in which it is alleged that the reasonable value per day of the Ramona is $400, and I do not find any evidence on this point. Therefore, there is no basis for estimating demurrage for her detention, other than the actual expenses during the time of the detention, which is included in the above sum. The cross-libelant's damages include the following items: The actual cost of temporary repairs $820.93, trucking freight, $197.34, water $4.50, unloading and reloading $193.36, extra pilotage $150, 107 tons of coal, $374.50, cost of permanent repairs, $10,828. and demurrage for 18 days at $213 per day, amounting to the total sum of $16,402.63. I allow said amounts as the damages proved in the case, the aggregate of damages of both parties to be divided equally, and no interest to be allowed to either party.

The Circuit Court of Appeals for the Ninth Circuit in the case of The Rickmers, 142 Fed. 305, 73 C. C. A. 415, has established a rule for this circuit that the allowance of interest on the amount awarded as damages for injury to a vessel in a collision is within the discretion of the trial court. In the exercise of discretion, I do not allow interest in this case, for the reason that I consider the Tremont to have been most in fault, and as the amount of the damages recoverable for her injury is largely in excess of the damages recoverable by the libelant, it would be unjust to augment the difference by allowing interest. The costs will be equally divided.

## On Rehearing.

To be consistent in adhering to the rules for estimating damages, established by precedents, the court will probably have to make an additional allowance to the owner of the Tremont to cover expenses of the ship during the time of her detention for repairs. Therefore the petition for rehearing must be granted.

I am disposed to allow the actual expenses of the ship for the 18 days of detention, not including insurance or office expenses. If the parties can agree on the amount, a decree can be submitted for signature, but if they are unable to agree I will make a computation.