### HAHO v. THE NORTHWESTERN.

(First Division.   Juneau.   August 30, 1920.)

No. 1942–A.

**1. Collision ⬳71 (2)—Admiralty—Damages.**

The gas launch Pheasant, belonging to libelant, was moored alongside another launch, which was in turn moored alongside of a third launch; said last-mentioned launch being moored alongside the city float, at a point about 136 feet north of the city dock. The Pheasant was so moored that part of her width extended beyond a line drawn from the front of the wharf to a dolphin north of and on a line with the dock front. While so moored, with her light exposed, the steamship Northwestern came into port, and in attempting to land at the front of the city dock collided with the Pheasant and damaged the vessel. It was calm, and no other unusual condition existed. *Held* the Pheasant was without fault in the matter of the collision, and her owners are entitled to recover the damages sustained by her as the result of such collision.

**2. Collision ⬳20—Improper Anchorage—Injury Avoidable Notwithstanding.**

Undoubtedly, if a vessel anchors in an improper place, she must take the consequences of her own improper act; but whether she is in an improper place or not, and whether properly or improperly anchored, the other vessel must avoid her, if it be reasonably practicable and consistent with her own safety.

**3. Collision ⬳134, 135—Admiralty—Damages.**

In this case libelant claims actual damages, as shown by the amount paid for repairs, and also for permanent injury to the hull by weakening, etc., thus decreasing the salability of the boat. *Held*, that such damages are too speculative and uncertain, and payment thereof refused.

Hellenthal & Hellenthal, of Juneau, for libelant.

John R. Winn, of Juneau, for claimant.

JENNINGS, District Judge.   Libel by the owner of the gas launch Pheasant against the passenger and freight steamer Northwestern for damages sustained by the former by reason of having been run into by the latter, in the harbor of Juneau, in the early morning of September 25, 1919, while the steamer was effecting a landing at what is known and referred to as the city dock, owned by the municipality of the city of Juneau.

---

⬳See same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

It appears that at a point 86 feet north of said city dock, and in the line of the face of said dock extended, was a dolphin of three or four piles, which the city of Juneau had constructed some few years ago on the representation of the Alaska Steamship Company (owner of the said Northwestern and other steamers) to the effect that the face of the dock was too short to permit the proper and expeditious landing of its boats (some of which were over 300 feet in length), and the further representation that the construction of said dolphin was necessary in order to eliminate the risk of collision between small vessels which might be lying at the nearby city float and large vessels approaching said city dock. or lying thereat and projecting beyond the face of the same.

It appears that at the time of the collision the Pheasant was moored alongside of another launch, which was in turn moored alongside of a third launch; said last-mentioned launch being moored alongside said float, at a point 136½ feet north of the said city dock. It further appears that at about 7 o'clock in the evening of September 25, 1919, the Pheasant arrived at the place at which she was moored at the time of the accident; that she was moored with her bow towards the city dock, and a proper light set in the rigging or on the guy line on the starboard side. It also appears that, when moored, said boat projected for at least half of its beam beyond the line of the face of the dock extended to said dolphin and beyond.

The master of the Pheasant, having set his light, departed from the premises, leaving no responsible person in charge of said boat. At about 1 a. m. in the morning of the 26th the steamer Northwestern approached the city of Juneau from the south, expecting to tie up as usual at the said city dock. In so tying up the method pursued is for the vessels coming in from the south to pass the city dock and city float for some distance, then turn and effect a port landing at said city dock. On the morning in question said steamer, having made the turn aforesaid, was nearing the city dock to effect a landing, and after the greater part of said vessel had passed the place where the said Pheasant was moored, the landing officer at the stern of the vessel gave a signal with a whistle, indicating to the master of the Northwestern, as that officer testified, that they were getting "close to something," where-

upon the said master gave her a little speed forward, so as to throw her stern out. Either the dangerous proximity to the Pheasant had not been noticed in time, or the action in throwing the stern out was not performed with the necessary quickness, for the Northwestern bumped up against the Pheasant and inflicted, as it is claimed, the damages set up in the libel.

It is the theory of the claimant (owner of the steamship Northwestern) that the Pheasant was moored in an improper place, in that there was, as alleged by claimant, a rule or custom that gas boats should not be moored or anchored to the seaward of the line of the face of the dock extended through the dolphin and beyond.

The testimony on the subject of rule and custom is not very definite or convincing, and in my opinion falls far short of being sufficient to establish either rule or custom.

On this point Mr. Nowell, the agent of the Alaska Steamship Company, testified:

"The wharf was notified to notify the gas boats that they must lie inside of that dolphin. I have notified many gas boats myself. I have been down to the wharf when our boats have been expected, and have been on the boats myself and requested them to keep on the inside of the dolphin, for fear we might touch them, and I have asked the wharfinger at the city dock to do it many times, and Mr. Cragg has done it many times, and it must have been, or should have been, generally understood from that that the—and I have often told the boats that if they laid outside of this dolphin it was at their own peril; that is what the dolphin was put there for, to protect us as well as them. There had been no written notice put up in regard to it, but it was a general understanding."

And Mr. Snow, the wharfinger, testified:

"It is understood, and they have been warned, that if they tie up outside of the line of the dolphin they did so at their own risk. Oftentimes the boats have tied up outside the dolphin, but we have warned them away before the steamers came in."

By whom it is understood does not definitely appear, nor does it appear that libelant had ever been "warned," or knew or heard of any such rule or custom, until after the accident. Besides, it is not perceived how anybody could make any binding rule, excepting some person with authority so to do.

In The Nettie Sundberg (D. C.) 100 Fed. 886, the court

denied the right even of a board of state harbor commissioners to make any such rule. The court said, on page 889:

"In addition to this, it is not within the power of the state, nor within the power of any board or body exercising authority from the state, to prescribe what rule of damages shall be applied in a court of admiralty in an action growing out of a collision between vessels under the circumstances stated in the rule above quoted, for * * . * the federal courts administering the general admiralty law 'can be governed only by the principles peculiar to that system as generally recognized in maritime countries, modified by acts of Congress independently of local legislation.' "

There is no harbor master, nor board of harbor commissioners, in Juneau, nor other officer or body having jurisdiction, except perhaps the city itself; and the city has not, so far as appears, prescribed any rule in the premises.

The court in the case just cited awarded full damages to the anchored vessel, although she had been anchored outside of the line established by the board of harbor commissioners, saying:

"She was without fault in the matter of the collision, and her owners are entitled to recover all the damages sustained by her as the result of such collision."

Juneau is a small town; its ocean-going traffic is meager, in comparison with that of other seaports, and the large boats tying up at its docks are "few and far between." There is no such magnitude of traffic or crowded condition of the harbor as obtains in larger cities, where accidents of this character "most do abound." I think this court may notice the fact that sometimes for days at a time (especially when the summer is over) no large freight or passenger vessel is lying at its docks or is expected. It does not appear that the Northwestern, or any other steamer, was due or was expected to arrive on the night in question, and Haho (master of the Pheasant) testified that at the time he arrived at the float there were many gas boats already tied there, and there was no other convenient place at which he could get in. He admits that half his boat was over the line, while Cragg testified that it was all over the line. However that may be, I am unable to find that under the circumstances the Pheasant was tied in an improper place. But, even if it can be so considered, yet I do not understand the rule of law to be that

that fact alone precludes a recovery, or that in and of itself it calls for a "halving" of damages, unless it was negligence contributing to the injury.

In The Clarita and The Clara, 90 U. S. (23 Wall.) 1, on page 14 (23 L. Ed. 146), the Supreme Court of the United States says:

"Undoubtedly, if a vessel anchors in an improper place, she must take the consequences of her own improper act; but whether she be in a proper place or not, and whether properly or improperly anchored, the other vessel must avoid her if it be reasonably practicable and consistent with her own safety."

This case was cited in The Nettie Sundberg, supra, where, on page 887 of 100 Fed., the court says:

"Even if it should be conceded that the Mabel and Edith was moored in an improper place, as is contended by the claimants, there is but one conclusion to be drawn from the facts above stated, and that is that the Nettie Sundberg was in fault. Of course, a case might be presented where the fact of collision with a vessel moored in a improper place would not of itself afford satisfactory evidence of negligence upon the part of the moving vessel, but the present is not such a case. The collision, as we have seen, occurred in broad daylight, at a point where there was ample room for the Nettie Sundberg to have passed without coming in contact with the Mabel and Edith."

Now, in this case the Pheasant had her light hung in an exposed place, to wit, on the guy line of her rigging, and there is no evidence whatsoever that the officers of the ship did not see or could not have seen it. Those officers were not asked, either on direct or cross examination, as to whether or not they or any of them saw the light. In the absence of evidence that they did not see the light, it must be presumed that they did see it; for it was in a place where it could have been seen. The master of the steamer was on the bridge, and must have noted (certainly should have noted) the position of the Pheasant, as, or even before, the prow of the steamer passed the launch. The master of the steamer testified that when he heard the whistle (indicating, as it did, that they were getting near something) he knew that the danger must be something on the port side, as there was nothing on the starboard side to come near to. The Northwestern, therefore, had plenty of sea room on her starboard side.

It does not appear from the evidence that there was any fog, or wind, or storm of any kind, or that the darkness was impenetrable, and so far as concerns the argument that the tide might have swung the Northwestern onto the gas boat, it is sufficient to state that her master testified that "it was high tide at the time—no tide at all."

I think libelant should have a decree for damages, for the case is, as shown by the evidence, in my opinion, the oft-recurring one of a moving vessel colliding with a vessel at anchor and without fault.

As to the damages, Coleman, who repaired the boat, testified that the rails were broken and the seams of the deck opened; also that the guards were broken, that the boat was rammed amidships and was there out of line 5 inches, that the stern post was loosened up a bit, and that seams of the hull had been opened up and had to be recalked. He further testified that the cost of all repairs made to the boat was $266, and that $50 would cover the cost of the repairs to the deck and all above the deck. The repairs to the hull, therefore, cost the difference, to wit, $216. When he was asked if the hull could be placed in the condition it was before the accident, he stated that he did not think it would be practicable to attempt such a thing. He said, however, it could be done, but that it would cost about $1,500. He further testified that the difference in value between the hull as it was before the accident and the value of the hull after the accident would amount to between $500 and $700, but in this connection he further testified that he could not say when he had examined the hull prior to the time the boat was brought to him for repairs in October, after the accident. At the time the boat was brought to him after the accident, he "put a line on her" to see whether she was out of line; but he had never "put a line on her" before. He further testified that the only way to discover whether a boat would be out of line 5 inches would be to "put a line on her." Mr. Morris, the workman at Coleman's dry dock, testified that the boat is now an inch and a half out of line. He says she has gradually worked back.

As the evidence shows that the cost of repairs was $266, that amount will be allowed. This included the repair of

6 A.R.—18

damages to hull, deck, railing, and stern post, the recalking, and in fact all discernible injury.

Damages are claimed, in addition, for permanent injury to the hull by weakening, etc., decreasing the salability of the boat. Our Circuit Court of Appeals, in the case of The Rickmers, 142 Fed. 313, 73 C. C. A. 423, held that such damages were too speculative and uncertain, saying:

"The evidence to which we have referred establishes the actual expenses incurred in repairing all known injuries to the vessel, but does not establish clearly or satisfactorily any permanent injury to this vessel not included in the cost for repairs and allowed as such. It is true there is testimony that after the ship had been repaired she was worth 10 per cent. less than she was worth before the collision; but such an estimate is plainly speculative and uncertain. It is not based upon any facts; there are no remaining injuries or defects pointed out. There is no injury or defect known or discernible to which this estimate can be applied. There is no known injury to any particular part of the vessel to which the court can refer and say, for this in jury which has not been repaired, an award of damages is made as and for a permanent injury. The rule of damages requiring certainty does not justify such an allowance."

And yet in that case, it seems to me, the evidence was not less indefinite than the evidence in the case at bar. Under the authority of that case I cannot allow any damages for injury to the hull over and above the injuries for which allowance is made, in the said sum of $266 aforesaid.

For detention of the vessel I allow $180, being for 9 days' detention at $20 per day; total sum allowed, $446, and interest from October 10, 1919, to date, at 8 per cent.

Let a decree be drawn accordingly.

☞See same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes